## THE LIVIETTA.

### (Circuit Court of Appeals, Fifth Circuit. April 14, 1917.)

### No. 2967.

1. SALVAGE ⊜26—COMPENSATION—ELEMENTS OF AWARD.

The following elements are to be considered in determining the amount of a salvage award: (1) The labor of the salvor in rendering the salvage service; (2) the promptitude, persistence, skill, and energy displayed in saving the property; (3) the value of the property employed by the salvors in rendering the service and the danger to which it was exposed; (4) the degree of danger from which the vessel and cargo were rescued and the value of the property.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–64, 68, 84.]

2. SALVAGE ⊜28—COMPENSATION—ELEMENTS OF AWARD—DERELICT.

Where the officers and crew of a vessel, which took fire at sea, left her, but were standing by in the lifeboats when salving vessels came to her assistance, she was not a derelict, in such sense as to have that considered as an element of the salvage award.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 69, 71.]

3. SALVAGE ⊜27—SALVAGE AWARD—PERCENTAGE OF SAVED VALUE.

Where the value of the property saved as the result of salvage operations is small, the percentage of such value awarded to the salvors, in order to give fair compensation for their services, is necessarily large, and such cases do not furnish a criterion of the percentage which should be awarded where the award value is large.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66.]

4. SALVAGE ⊜31—RESCUE OF BURNING VESSEL AT SEA—AMOUNT OF COMPENSATION.

When the Italian steamship Livietta was a few hours out from Port Arthur with a cargo of gasoline and kerosene in cases, there was an explosion in No. 3 hold, which partially wrecked the engine room, caused a leak, and made it impossible to work the engines, and also set the vessel on fire. The crew took to the boats, but stood by. An hour or two afterwards two other vessels appeared and undertook to give assistance. Later two others came to help. It required 5½ days to get the Livietta beached on the Louisiana shore, extinguish the fire, pump her out, and tow her to Port Arthur. Two of the salving vessels rendered service during practically all of that time, and the other two for shorter times. There was danger, owing to the nature of the cargo; but the sea was not unusually high, the salvors were prudent, and neither vessels nor crews were injured. The work was done with reasonable promptness and skill. The salved value of ship and cargo was $253,000, and the value of the salving vessels nearly $200,000. *Held*, that a reasonable allowance for all the services against vessel and cargo was $50,000.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 58.]

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Eastern District of Texas; Gordon Russell, Judge.

Suit in admiralty by the Gulf Refining Company, D. M. Picton & Co., and the Steele Towing & Wrecking Company against the steamship Livietta, Dall-Orso & Co., claimants, and R. Ligo, master, as bailee and claimant of her cargo. Decree for libelants, and claimants appeal. Remanded, with instructions.

F. D. Minor, of Beaumont, Tex., and T. Catesby Jones, of New York City (Harrington, Bigham & Englar, of New York City, and Minor & Minor, of Beaumont, Tex., on the brief), for appellants.

D. Edward Greer, of Houston, Tex. (W. T. Armstrong, of Galveston, Tex., on the brief), for appellees.

Before PARDEE, WALKER, and BATTS, Circuit Judges.

## Outline of Facts.

BATTS, Circuit Judge. November 9, 1915, the Italian steamship Livietta left Port Arthur, Tex., for Montivideo. She was an ordinary cargo steamer of 2,697 gross tons, 290 feet long, with four holds. Her engine room was situated amidships. Her decks were steel; the bulkheads between the engine room and hold No. 2, and the engine room and hold No. 3, were steel, and extended from the upper deck to the bottom. The bulkhead between holds 1 and 2 and holds 3 and 4 was steel up to the 'tween decks, and of wood in the 'tween decks. The cargo, 60,000 cases of gasoline and 20,000 cases of kerosene, was stowed in the four holds. In holds Nos. 1 and 4 were 10,000 cases of kerosene at the bottom, and the rest of the cargo space was filled with gasoline. The Livietta left Sabine Pass at 8:30 a. m., and arrived abreast of the Sabine buoy off Calcasieu Pass about noon. Her course was then changed to E. S. E. The ship was making at the time 8 miles an hour. While on this course, at 4:20 p. m., the ship being about 35 miles from the buoy off Calcasieu Pass, in latitude 29 deg. 15 min. north, and longitude 92 deg. and 42 min. west, an explosion occurred in hold No. 3.

The master, coming on deck from his cabin in the poop, found hatch No. 3 in flames. When the ship left port, two sections of the covers on each hatch had in accordance with terms of the charter party to the Texas Company for the carriage of the cargo, been taken off to permit ventilation. The remaining hatch covers of No. 3 were blown off by the explosion. The master calculated that the vessel was about 20 miles from the Louisiana coast, the nearest land. The first officer, in accordance with orders of the master, put the vessel to port, heading for land. The chief engineer then came on deck and informed the captain that serious damage had been done in the engine room, and that it was impossible for the men to remain below. He stated that the gangway from the bridge house to the engine room, which had been fastened to the bulkhead between No. 3 hold and the engine room, had been destroyed, and said that it was impossible to go down into the engine room to ascertain the extent of the damage. The second engineer reported that at the time of the explosion he was sounding the fresh-water tank, and that the explosion destroyed the floor of the

engine room. He said that, the stairway having been blown to pieces, he ran to the deck, using the boiler room gangway.

When the explosion occurred, the usual valves necessary for navigation were open. There were three sea cocks, one of which was for the circulating pump. The connection between the circulating pump and the surface injection was broken, permitting the water to come into the ship through a 4½-inch opening at the bottom of the engine room. The doors in the water-tight bulkhead between the engine room and hold No. 2 were open. The explosion dislocated the ventilator which led to the shaft tunnel. Water in the engine room could thus find its way both to the forward and after cargo compartments. The master, after securing this information with respect to the effect of the explosion in the engine room, ordered the engine stopped and the lifeboats lowered. The boats, ordered to remain near the ship, were anchored 200 meters to the windward. There was then little wind and little sea, and the flames in hold No. 3 were about as high as the funnel of the ship.

As night came on, two ships were observed approaching, one from the east and one from the west. Signals from the lifeboats were made with a night lantern and flash light. The boat approaching from the east was the E. L. Russell, with barges in tow, and the one from the west was the Gulfstream, bound out from Port Arthur. Both vessels were owned by the Gulf Refining Company. At a distance of about one-half a mile from where the lifeboats were anchored, the Russell sounded her whistle and began to operate her search light, whereupon the lifeboats were rowed toward her; the officers and crew going aboard when she was reached, about 8:30 p. m.

Capt. Lico said that he tried to make the master of the Russell understand that he desired to stay with his ship, but none of the officers or crew of the Livietta could speak English, and none of the officers or crew of the Russell could speak Italian. The Russell went around the Livietta, anchored her barges, and went to the Gulfstream. The Gulfstream had communicated by wireless with the Gulf Refining Company at Port Arthur, had asked for instructions, and had been directed to stand by. After having gone around the Livietta several times, the Russell approached near enough to permit a line to be thrown over a chock lead in the port bow chock of the Livietta. This did not require any one from the Russell to go abroad the Livietta, nor was it necessary for them to approach the after part of the ship, where the fire was burning. After making the line fast, at about 12 o'clock, the Russell began towing and continued for a period of about six hours, moving the Livietta four or five miles toward shore. During all of this period there was very little wind and sea. In the early morning hours the towing hawser parted, and the Russell left the Livietta and went up alongside the Gulfstream, made fast, and began taking fuel oil.

During the course of the night, several other vessels passed close to the steamship Livietta. One of these was the steamship Louisiana, owned by the Texas Company, to whom Capt. Ibersen by wireless reported. Capt. Ibersen testified that he was prevented by the Russell from getting near the burning vessel, but that he stood by until

daylight, and, as he could render no further assistance, because of the interference of the Russell, proceeded to Port Arthur. He stated that the sea was smooth and the wind a moderate breeze.

As the result of communications from the Gulfstream, the tug John Sealy, under charter to the Gulf Refining Company, and owned by D. M. Picton & Co., left Port Arthur at 11 p. m. the night of the 9th, and arrived the next morning, bringing Capt. Bliss, the port superintendent of the Gulf Company, who took charge of the salving operations. The Sealy made fast to the Russell, and provisions brought out by her for the Russell were transferred. Capt. Bliss ordered 10 men of the crew of the Livietta to go abroad the Sealy. The Russell and the John Sealy then cast off from the Gulfstream, which proceeded on her voyage. The John Sealy, after going around the Livietta, went to the Russell and secured a heaving line. She went alongside the Livietta on her port side near the bow. Some of her men went aboard the forward deck and made a hawser fast to the starboard bow chocks of the Livietta. At this time the Livietta was deep in water, which was level with the portholes amidships. The engine room compartment was full of water. The fire was still confined to holds Nos. 3 and 4 in the after part of the ship. A number of the crew of the Livietta went aboard her at this time, some of them going into the forecastle for their belongings, while others assisted the crew of the Sealy in fastening the hawser. This last statement is denied. About a half an hour was taken in making fast the hawser, a 10-inch manila rope. After the hawser was made fast, the Sealy steamed ahead of the Russell and passed a line from her stem to the Russell. The two tugs then towed tandem toward the Louisiana shore. About three-quarters of an hour after the towing began, the hawser to the Livietta parted; the parting being caused by the chafing of the hawser against the sharp stem of the Livietta, it having been made fast to the starboard bow bitt of the Livietta, and the helm of the Livietta being hard aport, with consequent sheering off to starboard.

The Sealy again went alongside, and the line was made fast as before; the crew of the Livietta again going on board. The hawser again parted from the same cause. The Sealy then went alongside the Livietta for the third time. The hawser was now made fast to the port bow bitt, and the towing proceeded until the Livietta was beached in four fathoms of water, about two miles off the Louisiana shore. When the Livietta was beached her stern swung to the westward, and dunnage on the starboard boat landing forward the No. 3 hatch caught fire. The Sealy went alongside, and some of her crew went aboard and put out the fire. This was the first time any effort had been made to put out fire on the Livietta; it being about 24 hours after the Russell had first sighted her.

The Russell then went to Port Arthur with Capt. Bliss, returning without him the next day. The Sealy remained near the Livietta. On the morning of November 11th efforts to extinguish the fire in the hatches were begun. The Sealy went alongside and began playing water on the fire, pumping from about 8 a. m. until 2:15 p. m. The Sealy then went to Port Arthur for Capt. Bliss. In the meantime, at about 1:15 p. m., the Russell arrived, began pumping,

and continued until 5:30 p. m., when the fire was declared extinguished. The Russell then went off and anchored for the night. During the night the fire broke out afresh, but no effort was made to extinguish it until the next day.

About daybreak of November 12th the steam tug Senator Bailey, which had been hired by the underwriters interested in the Livietta and her cargo, arrived from Galveston. As she approached, the Russell hove up anchor and went alongside the Livietta, taking the lee berth. She then began pumping water on No. 3 and No. 4 hatches. When the Bailey arrived she went alongside, taking the weather berth, and also began pumping on Nos. 3 and 4 hatches. About 8 a. m. the Sealy arrived and joined in the pumping. At 1 p. m. the fire had been extinguished, and the pumping ceased shortly thereafter.

Mr. Anderson, the underwriters' surveyor, who had come out on the Bailey, insisted upon pumping the ship out and floating her. He wanted to use both the Russell and Bailey for this purpose. Capt. Bliss, however, insisted upon using the Russell alone. The Russell pumped from 1:55 p. m. until 4:40, lowering the water about two feet according to the salvor's testimony, and about five inches according to the testimony of Anderson. During this period some feeling developed between Anderson and Bliss; Bliss at first threatening to throw off the Bailey's lines to the Livietta. At 4:40 p. m., however, Bliss accepted the services of the Bailey, which then began to pump. At 10:15 the ship started to swing to anchor, and she floated at 11 p. m. At 7:15 the next morning, November 13th, both tugs stopped pumping, and the anchor was hove up.

The Bailey got alongside the Livietta to pump her out as she was being towed to Port Arthur by the Sealy and Russell. These towing operations began at 9:20 a. m., and the vessel came to anchor at Sabine bar at 9:15 p. m. on November 13th. She did not go into Sabine that night on account of the character of the channel. The water in the Livietta gained during the tow to the pass, and all the attending vessels had to pump during the night to keep her afloat. The next morning she was docked at Port Arthur, and the pumping was resumed and continued till Monday morning.

Two libels were filed in the lower court, the first by the Gulf Refining Company, as owner of the steam tug E. L. Russell, and by David M. Picton & Co., as owners of the steam tug John Sealy; libelants demanding a salvage award against the hull and cargo of $300,000. The second was by the Steele Towing & Wrecking Company, as owners of the steam tug Senator Bailey; libelants demanding a salvage award of $50,000 for services rendered the hull and cargo. By supplemental libel it appeared that the Gulf Refining Company had purchased the Senator Bailey, together with all claims and causes of action for salvage asserted by the Steele Towing & Wrecking Company.

Bonds were demanded of the claimants of the Livietta and her cargo in the sum of $350,000. An application for the reduction of the bond having been made, the court appointed appraisers, who filed a report to the effect that the ship was worth $191,000, and it was agreed that the cargo was of the value of $62,029.31. The ship was released on

a bond for $100,000, filed by the claimants of the vessel, and bond for $35,000, filed by claimants of the cargo.

Trial resulted in a salvage award to the Gulf Refining Company and D. M. Picton & Co. in the sum of $48,750 for salvage services to the steamship, and of $26,250 for salvage services to her cargo. The amount of the award against the ship was reduced $750, and against the cargo $250, because of the conduct of Capt. Bliss with reference to the tug Senator Bailey. Other facts which may appear to be pertinent will be hereafter stated.

[1] The following elements are to be considered in determining the amount of a salvage award: (1) The labor of the salvor in rendering the salvage service. (2) The promptitude, persistence, skill, and energy displayed in saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which it was exposed. (4) The risk incurred by the salvors. (5) The degree of danger from which the vessel and cargo were rescued, and the value of the property.

In this case each of the elements appears, but the court is, nevertheless, of the opinion that the very large award is not warranted. The labor was considerable; there was a reasonable promptitude, skill, and energy displayed in rendering the service; the value of the property employed by the salvors was large; the risk incurred was substantial; the value of the property saved was considerable, and the degree of danger from which the property was rescued was great; but we nevertheless conclude that the misfortunes of the Livietta and of the owners of the cargo should not be increased by the payment of so large a sum as has been awarded by the District Court.

### Service Rendered by the Gulfstream.

The first explosion on the Livietta occurred at 4:20 p. m. Tuesday, November 9th. About night the Gulfstream approached the burning vessel, and before ascertaining her name sent messages to Capt. Bliss at Port Arthur, and later advised that she was standing by to pick up boats. Bliss asked to be kept posted. Messages to him at 9:16 advised that Russell was standing by and picking up men in boats, and one at 9:35 stated that burning vessel was an Italian, with Texas Company oil cargo, and that Russell had anchored barges and was going to put hawser on steamer, and asked that Russell be sent stores and Sealy to help. Bliss advised that he was leaving on Sealy with ample provisions, and directed Gulfstream to stand by until arrival of Sealy, and to see that Russell got line on ship. After the line of the Russell parted at about 6 the next morning (Wednesday, November 10th) she went alongside the Gulfstream and received stores and fuel oil. Upon the arrival of Capt. Bliss at about 7 a. m., he went aboard the Gulfstream, and at 8:15 communicated with his office. Shortly thereafter the Gulfstream proceeded on her voyage. Her service extended over not exceeding 15 hours.

### Services Rendered by the Russell.

On the afternoon of the 9th, the Russell, en route from Tampa to Port Arthur, with three tank barges in tow, about 5 or 6 o'clock sighted

a fire, being at that time perhaps 14 miles from the burning ship. Slightly changing her course, the Russell reached the Livietta about 7 p. m. The master states that when he got in the vicinity of the ship explosions were occurring, the flames reaching as high as 100 feet. Getting within about half a mile, he slowed down. Using the search-lights, he could see four lifeboats filled with people. These boats, being filled with the crew of the Livietta, came up to his tug. The crew, 26 in number, was taken aboard the Russell. The Russell anchored the barges and then went to the Gulfstream, ascertaining from the captain that the latter had communicated with Capt. Bliss at Port Arthur. At about 10 or 11 he proceeded to the Livietta, having in the meantime been informed as to the character of the burning cargo. He tried to get a line on the bow of the Livietta, but was not close enough. Undertaking to get a big hawser on the Livietta, there was nothing to climb on, and he was compelled to hitch up a six-inch line on the port side. At 11:30 or 11:40 p. m., he got a six-inch line through the chock. According to his statement the sea was choppy, and he could not get his boat to hang onto the ship. At that time the fire was burning in No. 4 hold, and its flames increasing and the explosions continuous. He towed the Livietta that night about five miles, being compelled to tow slowly, because the vessel's helm was hard aport. The wind was blowing across the vessel, and he took precautions to keep it that way, to prevent the hatches forward from catching fire. The towing continued from 11:30 until 6 the next morning, at which time the line parted 15 or 20 fathoms from the ship. He then returned to the Gulfstream, two or three miles away, taking stores and fuel oil from her. While there the John Sealy came up with Capt. Bliss aboard. After this the Russell and Sealy went alongside on the port bow, and, taking the hawser of the Russell, some of her crew went aboard the Livietta. The hawser was pulled up by a small line and made fast to the starboard chock on the bow of the Livietta, this requiring 20 or 25 minutes. The two tugs then started towing the ship toward shore, and after pulling about an hour the hawser parted. The tugs were stopped, the Sealy went back on the port side near the bow of the Livietta, and the hawser, after being wrapped, was again fastened as before. The towing then proceeded until about 2 o'clock, when the hawser again parted. The hawser was again attached, this time, however, on the port, and there was no further chafing. The towing then proceeded until about 4:30, when the ship grounded in four fathoms of water. When the ship was beached, the master testified that the sea was so rough that the hawser could not be unfastened, and it was cut. He said the sea was so rough it was impossible to go alongside the Livietta, and on this account no effort was made to put out the fire. The Livietta having been beached, the Russell left for Port Arthur, taking Capt. Bliss and the captain and a portion of the crew of the Livietta. Having arrived at Port Arthur during the course of the night, the Russell left again at 5:30 a. m. for the Livietta, arriving about 1 o'clock in the afternoon. The Sealy had in the meantime gone alongside the Livietta and begun pumping water on the fire. Upon her arrival the Russell also commenced playing water on the fire, and at 1 o'clock the fire was practically out, and at 5:30 the Russell

stopped pumping. The Sealy in the meantime, at about 2:30, had left for Port Arthur. The Russell stood by, and during the night (of the 11th) the fire broke out again in hold No. 4, but the master of the Russell, on account (he stated) of the darkness, and of the character of the sea, thought it unsafe to attempt to fight the fire at that time. At 6 o'clock the next morning the Russell went alongside the Livietta again and began pumping on the fire. At 8 o'clock the Sealy was back again. Just before the arrival of the Sealy, the Senator Bailey came up and commenced pumping on the fire. The fire was extinguished about 11 o'clock, but the pumping was continued until 1, to cool the decks and prevent a recurrence of the fire. After extinguishing the fire on the afternoon of the 11th, suction hoses of the tugs were put in the holds of the Livietta, and pumping to float the ship began. The Russell pumped by herself for two or three hours, and then the Bailey began to pump. The Livietta was floated about 11 o'clock. The pumping continued until about 8 o'clock the next morning, at which time the pumping was stopped and the tow to Port Arthur began. In the meantime the anchor and rudder had been gotton in workable condition. In the tow to Port Arthur on the morning of the 13th, the Russell and Sealy were pulling the ship, and the Bailey went alongside, furnishing steam for the steering gear. When Sabine bar was reached at 9 o'clock Saturday evening the vessels anchored on account of the character of the channel at Sabine Pass. Water in the Livietta gained during the tow to Sabine Pass, and the ship was getting low in the water again. The Russell's pump having choked up from trash, the pumping by that vessel had to be stopped, and, notwithstanding the Bailey was pumping during this time, the Livietta got so low that the water was coming over the deck again. When the Russell's pumps had been cleared, and she began pumping again, the water was lowered and the tow was proceeded with; the vessels reaching the docks of the Gulf Refining Company at Port Arthur about 2 o'clock in the afternoon. The Russell continued to pump water out of the ship all of Sunday, Sunday night, and Monday morning.

The services of the Russell may be thus summarized: From 5 p. m. Tuesday, November 9th, to 7 p. m., going to Livietta; from 7 p. m. to 10 p. m. Tuesday, picking up crew, anchoring barges, going around Livietta to determine conditions and proper approach; from 10 to 11:30, getting a line to Livietta; from 11:30 p. m. Tuesday to 6 a. m. Wednesday, towing Livietta toward shore; from 6 a. m. Wednesday to —— a. m. going to Gulfstream, taking stores and fuel oil; from —— a. m. Wednesday to —— a. m. Wednesday, going alongside Livietta with Sealy and fastening hawser; from —— a. m. Wednesday to 4:30 p. m. Wednesday, towing Livietta toward shore; from 4:30 p. m. Wednesday to 1 a. m. Thursday, going to Port Arthur with Capt. Bliss and part of crew of Livietta; from 1 a. m. to 5:30 a. m. in port at Port Arthur; from 5:30 a. m. Thursday to 1 p. m., returning to Livietta; from 1 p. m. Thursday to 5:30, pumped on fire; from 5:30 p. m. Thursday to 6 a. m. Friday, stood by; from 6 a. m. Friday to 1 p. m., pumping on fire and to cool decks; from 1 p. m. Friday to 8 a. m. Saturday, pumped to float Livietta; during this period anchor and rudder of Livietta put in workable condition; from 8 a.

m. Saturday to 9 p. m., towed Livietta to Sabine Pass; from 9 p. m. Saturday to —— a. m. Sunday, cleaning pump and pumping to keep Livietta afloat; from —— a. m. Sunday to 2 p. m., towing to Port Arthur; from 2 p. m. Sunday to ——a. m. Monday, pumping.

The service was substantially continuous from 5 p. m. Tuesday, November 9th, to —— a. m. Monday, November 15th, the period from 5:30 p. m. Thursday to 6 a. m. Friday being the only time with regard to which question may be raised as to whether she was doing all that could be done.

### The Services of the John Sealy.

In response to the suggestion of the Gulfstream, received at 9:35 p. m. Tuesday, November 9th, the John Sealy left the Gulf Refining Company's docks at 11 p. m., reaching the Livietta about 7 o'clock on the morning of the 10th. Passing the burning ship, she went on to the Gulfstream, about two miles away; the Russell lying along the lee of this ship, the tug tied up alongside the Russell and delivered the provisions and stores brought out for her. The crew of the Livietta was transferred from the Russell to the Sealy under directions from Capt. Bliss. The provisions delivered, the Sealy went over to the Livietta, and the master went aboard her with some of the crew. By the time they were aboard, the Russell came up and threw out a heaving line, and the ten-inch hawser was hauled up and made fast to the Livietta, after which the two tugs proceeded to tow the vessel toward the shore. Shortly after the Livietta was beached a fire broke out in dunnage on port landing, forward of hatch No. 4. The Sealy went alongside and put out the fire, some of her crew going aboard. During the night, after the beaching of the Livietta, the Sealy remained about 150 feet from her. The next morning at 7:30 the tug was taken alongside the Livietta, and two streams of water were put on the fire in hatches 3 and 4. She continued to fight the fire until 2:15, after which she went to Port Arthur, arriving about 9:30. She made report to Capt. Bliss, who had gone in on the Russell the day before. The same night, about 12 o'clock, she again left for the scene of the fire with Capt. Bliss aboard, taking water and stores, and arrived on Friday, the 12th, at about 8 o'clock. The fire having during her absence again started, she went alongside the Livietta and participated in the fight against it with the Russell and the Senator Bailey. Her master went aboard, and finding the deck raised at one point about 15 inches as the result of the fire, about 60 rivets were cut and the deck pried apart, in order to get streams of water under the deck. After putting out the fire, the Sealy helped to tow the Livietta to Port Arthur, and in the pumping operations at Sabine bar, and in getting the ship into the canal at Port Arthur on Sunday afternoon. The tug continued to pump until Monday. The salvage work of the Sealy was almost continuous from about 9 o'clock of the night of the 9th, when she began to prepare to go to the wreck, until Monday morning of the following week.

### The Services of the Senator Bailey.

The Senator Bailey left Galveston under a contract with interested underwriters, and performed no salvage service until the morning of

the fourth day; that is, Friday, November 12th, when at about 8 a. m. she began to pump to put out the fire, and continued until the fire was out at about 1 p. m. After the fire had been extinguished on that day, the Russell began pumping to float the ship, and pumped for two or three hours alone; Capt. Bliss declining the services of the Bailey. Not being able to reduce the water in a satisfactory way, Capt. Bliss then permitted, at about 4:40 o'clock p. m., the Bailey to begin to help in the pumping. She pumped until about 8 o'clock the next morning, Saturday, November 13th, at which time the pumping was stopped and steps were taken to tow the Livietta to Port Arthur. The Bailey went alongside the Livietta and furnished steam for the steering gear. When the bar at Sabine was reached, about 9 o'clock Saturday evening, the vessels anchored. Water had gained in the Livietta during the tow, and she went so deep that she was in danger of sinking. The Russell's pump having choked up with trash, the principal pumping at the most critical period was done by the Bailey. On Sunday morning the Bailey participated with the Russell and Sealy in taking the Livietta to Port Arthur, and stood by during the balance of the day, ready to pump, if necessary. The service of the Bailey was continuous from about 8 o'clock on the morning of Friday until —— o'clock Sunday afternoon.

### Services of the Barges.

To begin the salvage service promptly it was necessary that the barges Allegheny, Mingo, and Pettibone be anchored. They remained at anchor until November 13th, when they were towed into Port Arthur. They performed no direct service.

The charter values of the several vessels were: Tug Sealy, $50 per day; tug Russell, $100 per day; tug Bailey, $100 per day; steamship Gulfstream, $1,000 per day; the barges detained, but not participating in the salving, $250 per day.

### The Promptitude, Skill and Energy Displayed in Saving the Property.

The foregoing recital of the operations of the tugs Russell, Sealy, and Bailey indicates that there was no lack of promptitude in performing the needed service. Upon the arrival of the tug Russell, no immediate effort was made to tow the burning vessel ashore, but prudence required that the condition of the vessel and the risks to be assumed and to be guarded against should be given careful examination and consideration. There was no absence of promptitude on the part of the Gulfstream. It communicated with Capt. Bliss, even before it arrived at the Livietta, and thereby helped to promptly organize the effort to save the vessel and her cargo. Capt. Bliss acted with prompt energy.

With reference to the skill displayed, no complaint has been made, except with reference to the manner in which the hawser was made fast when the towing began on the morning after the beginning of the fire. Twice the hawser was worn in two by the fact that it came in contact with the stem of the vessel. The hawser was finally, on the third attempt, properly fastened, and the towing proceeded without

further delay. It may be that absence of skill was shown in not continuing the pumping after the fire first appeared to have been extinguished. Certainly, if it had been continued at that time, much more of the cargo could have been saved, and the injury to the vessel would probably have been materially less. Possibly the beaching of the vessel could have been accomplished earlier than it was, and possibly the fire could have been sooner extinguished; but, on the whole, the salvors showed about all of the promptitude prudence would permit, and all of the skill and energy required for the preservation of the property.

### The Value of the Property Employed by the Salvors, and the Danger to Which This Property was Exposed.

The District Judge found the values as follows: The E. L. Russell, $50,000; the John Sealy, $25,000 to $30,000; the Bailey, $90,000 to $100,000; value of the three anchored barges, about $160,000. Neither of the vessels had cargoes. The Gulfstream was exposed to no danger. The barges were not subjected to any danger, and their value can be considered in connection only with the time actually lost by them.

There seems to be great diversity of opinion as to the extent of the danger to which the vessels actually engaged in the salving were exposed. The Livietta was loaded with 600,000 gallons of gasoline and 210,000 gallons of kerosene, and a part of this cargo was afire. Some of the witnesses testified that the flames were shooting up from 50 to 100 feet. It was also stated that explosions were continuously occurring, whereby cases of gasoline were blown high in the air, where they exploded. There were generalizations to the effect that the exploded cans fell around the vessels approaching the Livietta. The other evidence would seem to indicate that this is one of the exaggerations incident to admiralty cases and the inevitable outcome of fires. At all events, however, it can very reasonably be insisted that with 60,000 cases of gasoline and 21,000 cases of kerosene aboard, and with two of the four holds in which this inflammable material was contained burning, the element of danger to any vessel which had to approach close enough to place a hawser on the Livietta was not absent.

It is, however, to be kept in mind that none of the salving vessels acted without deliberate caution. Before any effort at all was made to tow the Livietta, the Russell went around her a number of times, and finally made a line fast at about 100 feet from the nearest point of the fire. The direction of the wind was such as to carry the smoke, flames, and exploding cans away from the Russell, when she approached to attach the line on the first night. The conduct of her master on that and subsequent occasions indicates that he regarded it as reasonably safe to do that which was involved in towing the Livietta. After the line parted on the first night, the Russell laid by, without any effort to do more, and from that time until the making fast of the hawser by the Sealy on the next morning, incurred no risk of any kind. When the Sealy attached the hawser on the second day, the fire had been burning for many hours, and the vessel had been going down in the

water during all that period. A very considerable part of the kerosene and gasoline was in water. The boiler fires had been extinguished. There was no serious danger to a vessel properly approaching; and while the Sealy was attaching the hawser at the point most remote from the fire, there seems to have been no hesitancy on the part of the members of her crew and the crew of the Livietta in going back to the after part of the ship where the fire was burning. During the towing on the second day the wind was abeam, or lacked only a few points of being abeam, during the entire time. This was doubtless, in part, the result of careful and skillful handling of the tow; but apparently neither of the towing vessels was in any character of danger during that operation. The small fire that broke out after the vessel was beached was extinguished by members of the crew of the Sealy, who went aboard the burning steamer. Photographs taken at the time indicate that they were in no great danger, and that, if they were, they entirely failed to realize that fact.

No effort was made to extinguish the fire in the holds until the next morning. The Sealy stood by, claiming that the sea was too rough to safely pump during the night. The Russell went to Port Arthur. The pumping to extinguish the fire was not begun until much of the cargo and the engines had been submerged, and there is nothing to suggest that anybody assumed that any great danger from fire existed during the period of this work. When during the course of the ensuing night the fire again started, no danger ensued to the salvors; the Sealy having gone to Port Arthur and the Russell standing by without effort to extinguish the fire. On the following day the fire was put out; all of the vessels participating, and each being so placed as to be subjected to a minimum of danger.

The condition of the sea during the salvage operations is the subject of controversy, but there is no contention that it was at any time seriously high. Capt. Lico says that about midnight on the evening after the fire started "the wind was fairly strong from the southeast, with a rough sea." The master of the tug John Sealy stated that he would not undertake to put out the fire after the beaching, because of the "high sea." The master of the Russell would do nothing with reference to the fire, which broke out after being apparently extinguished, because of darkness and the rough sea. The salvors are entitled to very little regard for prudently abstaining from action when the sea was rough. Photographs and other evidence indicate that the sea was "choppy" and rough in that degree which is normal when a moderate southeast wind is blowing on the Gulf, during most of the period of the salving operations.

Our conclusion is that no very great danger in fact existed to any of the vessels engaged in the salving. The testimony shows that the persons in charge were familiar with oil and gasoline fires, and realized the extent of the danger to which the vessels under their charge were subjected. Whatever dangers existed were realized and prudently avoided.

It must further be kept in mind that the dangers were such as the salvors were very willing to incur. The evidence indicates that there would have been no difficulty in getting other vessels to assume these

risks. There is no disposition to minimize the dangers, and no disposition to inadequately reward those by whom they were incurred, but the case is to be distinguished from one in which the salving vessel and crew are subjected to great danger in order to save passengers, cargo, and ship, under circumstances where the loss would be total, but for the courageous conduct of the particular salvors.

### The Personal Risk Incurred by the Salvors.

This element has already been, in a large measure, discussed. The salved ship was loaded with a cargo of an inflammable and explosive nature. There had been an explosion, the cause of which was not understood. During the course of the burning further explosions had occurred. The flames were going high into the air, and cans of kerosene and gasoline were being thrown into the air. It was necessary on three occasions to go aboard the vessel to fasten the hawser. It was necessary on another occasion to go aboard to put out a small fire, and again to pry up the deck to get the water underneath. The sea was "choppy" and sometimes rough. There was no absence of danger. But we do not quite agree with appellees in characterizing the conduct of the officers and crew of the John Sealy as perilous and foolhardy. Indeed, the conduct of the salvors throughout was marked with decided prudence, and the conclusion of the officers undoubtedly was that men could be sent aboard without any very great danger.

### The Degree of Danger from Which the Vessel and Cargo were Saved, and the Value of the Property.

The value of the Livietta as salved was fixed at $191,000, and the value of the cargo that was saved was placed at $62,029.31, or a total of $253,029.31. The extent to which the Livietta and her cargo were in danger is the subject of controversy. It is insisted, on the one hand, that but for the beaching they would in two or three hours have gone down, and the loss would have been total; on the other, that because of the buoyancy of the cargo the vessel would not have sunk, and that the fire would have been extinguished by the water.

We think the danger of a total loss was very real, and certainly the conditions were such that no one would have been justified in accepting expert theories, rather than in promptly taking her to shallow water. The depth of the sea at the place of the explosion was 50 or 60 fathoms, and, of course, if the vessel had sunk, the loss would have been total. There had been an explosion aboard. The cause was not known. The extent of the damage to the vessel could not be determined. She was gradually going down, and there was certainly every indication of extreme danger.

It is not difficult to conclude that the facts, some as they could then be seen, and others as they have since developed, were in accord with the appearance of danger. Water was coming in through a 4½-inch opening. The place and extent of the opening could not be ascertained. The ship's pumps could not be used. Before the vessel could be beached, water was coming through the portholes. Even after the fire had been extinguished, and the vessel had been taken to Sabine Pass,

she was apparently in great danger of sinking. In addition to the danger of sinking was the danger from fire and explosions. The first explosion had seriously injured the vessel, and there were possibilities of explosions more destructive. The fire had extended from hold No. 3 to hold No. 4. A change in the wind or the position of the vessel would have endangered the cargo in holds 1 and 2, and everything on and above decks. If the contention that the vessel would not have sunk is correct, a part of the cargo would have been saved by the water which came into the holds; but we will not now predicate a judgment on a theory no one would have been justified at the time in acting upon.

We are warranted, we think, in concluding that, but for the help promptly given, the Livietta and her cargo would have been a total loss. It is to be remembered, however, that she was on an ocean path that was constantly used by vessels from which she could have received help. The danger was not of that character which would have existed if she had been far out at sea, or in waters rarely used.

[2] Counsel devote much time to a discussion of whether or not the Livietta had become a derelict. At the time of the approach of the Russell no one of her officers or crew was aboard her; but it cannot be said that she was abandoned. They were in lifeboats alongside, and were there doubtless for the purpose of again going aboard, if it appeared feasible and safe, and of securing the services of other vessels to salve her, in any event. Even if she may have been a technical derelict, it would not be proper to apply to her the legal consequences, so far as the amount of salvage is concerned, which have sometimes been applied to vessels given up as totally lost.

Going over the entire record, and giving particular consideration to the matters which have heretofore been mentioned, we are of the opinion that the award should be substantially reduced, and have concluded that $50,000 would be a reasonable amount for the services rendered and for the accomplishment of the public policy involved in encouraging, by liberal rewards, services of the kind performed by the salvors in this case.

[3] Our attention has been called to a number of cases in which awards have been made of large percentages of the total values of the salved vessels. In a number of these cases 50 per cent. of the salved value was awarded, and in some cases a much larger per cent. In no case cited, however, in which the award was as much even as 30 per cent., was the amount awarded nearly as large as we give in this case. In one case only of all those cited by libelants was the amount we award exceeded. In that case, The Camanche, 8 Wall. 448, 19 L. Ed. 397, a wrecking company sent equipment from New York to San Francisco, and engaged in arduous work, largely by divers; an agreement of 27 per cent., amounting to $110,000, was approved. The case could hardly be used as the basis for criticism of the award we make herein. If the values in the instant case had been small, we would have been compelled to award a larger per cent., though it would probably have been a smaller amount. If the work had been the same, and the amount saved had been $20,000, it would not have been possible to make a proper award, except by exceeding 50 per cent. We are giving only

about 20 per cent. of the salved value, but we believe it compensates for the labor performed and the risk incurred, and leaves a sufficient margin of award to amply conserve the public policy involved.

[4] The trial judge reduced the amount of his findings from $75,000 to $74,000, upon a consideration of the conduct of Capt. Bliss with reference to the Senator Bailey. In reducing the award, we have not permitted to influence us the efforts of Capt. Bliss to save for his company all the legitimate rewards of labor done and dangers incurred. The circumstances were not such as to develop refinements of courtesy; and we think the conduct of Capt. Bliss, if not entirely in conformity with the rules of etiquette, was at least entirely in accord with the promptings of nature.

Nor have we reduced the award on account of the fact that libel- 'ants primarily demanded a sum in excess of that to which we think them entitled. Zeal of counsel, manifested by excessive demands, is not to be taken as seriously as such action on our part would imply. Besides, any possible effect of exaggeration by libelants of the amount and value of the services should be held canceled by the disposition to diminution displayed by the claimants.

No reason has been suggested to us why the cargo should pay a larger percentage of award than the vessel. The $50,000, therefore, determined upon as the total amount of the award, is apportioned $37,500 against the Livietta and $12,500 against her cargo. The case will be remanded, with instructions to the court below to render judgment in accordance with this opinion.