## THE ANAHUAC.

### CENTRAL WHARF TOWBOAT CO. et al. v. UNITED STATES.

(District Court, D. Maine, S. D. January 30, 1924.)

No. 865.

**1. Salvage ☜30, 38—Award for salving stranded vessel.**

A tank steamer, stranded on a rocky coast of Maine and disabled, was released and towed to port by a revenue cutter and two tugs. The tugs did the greater part of the work; the cutter being unable to come close because of shallow water. Owing to high seas, the service, including the towage, was dangerous, and the steamer was in great danger, if not promptly rescued. Her salved value was $70,000. *Held*, that $15,000 was reasonable compensation for the entire service, of which the tugs were entitled to three-fifths.

**2. Salvage ☜27—Valuation of salved vessel.**

The value of a salved vessel taken as the cost of reproduction, less an allowance for depreciation, in the absence of evidence of a market value.

**3. Salvage ☜27—Award where government vessel assists.**

Where a government vessel and others co-operate in a salvage service, the proper method of making an award to the latter is to fix the value of the entire service and deduct the share earned by the government ship.

In Admiralty. Suit for Salvage by the Central Wharf Towboat Company and the Saco River Towing Company, owners of the steam tugs Cumberland and A. G. Prentiss, respectively, against the United States, owner of the steamship Anahuac. Decree for libelants.

Thompson, Hoague & Hill, of Portland, Me. (Nathan W. Thompson, of Portland, Me., of counsel), for libelants.

Arthur M. Boal, Asst. Admiralty Counsel, U. S. Shipping Board of Washington, D. C., and Wm. B. Nulty, Asst. U. S. Atty., of Portland, Me.

HALE, District Judge. This libel for salvage is brought under the Shipping Act of March 9, 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*), by the Central Wharf Towboat Company, a corporation, owner of the seagoing steam tug Cumberland, and by the Saco River Towing Company, a corporation, owner of the steam tug A. G. Prentiss. Each libelant joins in the action, in behalf of its tug and

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the captain and members of the crew of the tug. The two libelants sue jointly, asking for an award in a lump sum, to be divided later between the two tugs and among all parties interested.

[1] The steamer Anahuac is an oil tanker of 863 tons burden, owned by the United States of America. She left Bangor, Me., April 15, 1923, bound light, to East Braintree, Mass. During the evening of April 15th, when off Halfway Rock, on the coast of Maine, she encountered a severe southeast snowstorm, lost her bearings, and struck heavily on the ragged ledges of Fortune's Rock, near Biddeford Pool, on the Maine coast. In trying to get the vessel off the ledges, by means of her own power, the blades were stripped from her propeller, and the rudder was jammed hard to starboard. Not being able to free the vessel by means of her own power, the master ordered her fires to be drawn and the lifeboats launched; then the master, with the crew, left the steamer, went ashore, and walked to the Coast Guard station at Fletcher's Neck, nearby, where they were cared for. The next morning the steam tugs A. G. Prentiss and Cumberland and the United States revenue cutter Ossipee arrived in the vicinity of the wreck, shortly before high water. The tanker was lying between two ragged reefs, surrounded by jagged rocks, her bow inshore, her stern and counter exposed to the sea. A line was run to the wreck, and all three of the vessels pulled, and finally floated the Anahuac. There was a heavy sea running. Capt. Ridgely, the commander of the cutter, testifies that the ship was pounding so heavily that he thought and remarked that, if she did not come off on that tide, the chances were she could not be got off, and Capt. Norton of the Coast Guard says he does not think that they could have run a line to the vessel next day, as there was then a much higher sea.

The revenue cutter did effective service in assisting in the matter of salvage, but she was unable to get in, so near the shore, as the tugs, so that the greater part of that service was done by the tugs. It is doubtful whether the two tugs could have got the vessel off without the aid of the cutter; it is quite clear that the cutter could not have floated her without the aid of the tugs. The whole work had to be done with great haste, on the high water; by the timely aid of a heavy rolling sea coming in, while the tugs and cutter had a strain on her, the tanker was floated.

There can be no question but that the tugs were in some danger while they were doing the towage service. They were also in danger while towing her into Portland. The tanker had a sharp list to starboard, and was down by the head, with her rudder jammed hard astarboard, causing the tanker and the towboats to roll badly. The Cumberland started with the tow, and it was soon found that she could not control her alone, as the tanker would yaw up on the Cumberland's port beam, and then shift and run on the Cumberland's starboard beam. As it was impossible for the Cumberland to tow the tanker alone, the other tug, the Prentiss, ran a line from her own stem to the stern of the tanker, and then ran off on the port quarter of the tanker, and tried to keep her straight, by holding her stern in, thus making her follow the Cumberland. The sea was running so high that it was a question whether they would "try to put her in somewhere until the sea mod-

erated some." There is no need of reciting testimony showing the heavy sea and the dangers of the towage to Portland. Capt. Ridgely, of the cutter, found it necessary to give up all engagements in Portland and to stand by the tugs, throughout the trip from Fortune's Rock to Portland. It required great skill to tow her, under all the circumstances of the service. If she was towed too fast it would be likely to trip her, and if too slow she became unmanageable. If too much power was used in breaking a sheer, it meant the parting of the lines, and when the lines parted, as they did many times, there was great danger of her going ashore and being lost.

[2] There is much contradictory testimony as to the value of the vessel. The total cost of repairs to the Anahuac was in the vicinity of $45,000. While lying in Portland, the government asked for bids, and were offered $23,000 for her hull in its damaged condition. She was sold to the Atlantic Refining Company for $95,000, after being repaired.

It is urged by the libelant that the court should find that $70,000 is the fair value of the tanker, after the salvage service had been rendered; that William Stewart, one of Lloyd's surveyors, who was familiar with the cost of repairs and with the value of shipping property, figured the value of the tanker in accordance with American shipping practice, and that his testimony is the only affirmative evidence upon which the value can be fixed. Capt. Stewart's result was arrived at by taking the cost of the construction of a new vessel, and from this sum deducting the depreciation for three years at 5 per cent. per annum, and the cost of repairs, without consideration of market conditions or market values. It is urged that this method of computation has been approved by the Circuit Court of Appeals for the Second Circuit in The Cushing, 292 Fed. 560, 567. While this method of obtaining the valuation is not altogether satisfactory, it is the best testimony the case affords, for I do not think it would be fair to make a valuation based upon the rejected bids. It may be said the sum of $70,000 is a higher valuation than the proofs justify; but it is the nearest I am able to arrive at as the value of the vessel.

In The Lyman M. Law (D. C.) 122 Fed. 816, 823, this court discussed the elements which enter into an award for salvage services. There is no necessity for repeating these well-known elements. Salvage is not merely a question of estimating the value of service or of getting at a fair compensation for service; it is a question of deciding how much bounty shall be given for the encouragement of other vessels to volunteer in such adventures.

[3] The learned proctor for the libelant has made a detailed analysis and comparison of The Lyman M. Law with the case at bar. This comparison is interesting, and, in some respects, helpful; but in rendering an award for salvage services no one case is exactly like another. There is a wide field for the exercise of careful judgment. This case differs from almost all the cases in the books in the fact that some of the salvage service was rendered by a large government vessel, the revenue cutter Ossipee, which is not eligible to receive an award in salvage. She was a larger vessel and of more value than either of the tugs employed in the service. So far as the record shows, the Cumberland was the largest and best tug east of Boston, and was worth in

the vicinity of $50,000. The Prentiss was a smaller tug, and was worth in the vicinity of $25,000. The dangers of the service were largely borne by the two tugs, although it cannot be said that the cutter was entirely out of danger, even under the successful management of her very able commander. Some salvage services were performed by the crew of the life-saving station, and some by a motorboat; but the record shows no claim made for these services. The services which we are to consider are those of the Ossipee and the tugs Cumberland and Prentiss. The proper way to fix the valuation for these services is to make a total award of salvage and fix the portion of that total award which should go to the Ossipee, and the portion which should go to the two tugs, as by agreement the services of the two tugs constitute a joint service. This is the method of award which was approved by the Circuit Court of Appeals in The Kanawha, 254 Fed. 762, 764, 166 C. C. A. 208. It is not altogether clear what proportion of the award should be given to the Ossipee and what proportion of the award should be given to the two tugs. It is a case for the exercise of sound judgment.

It is urged by the learned proctor for the government that the Ossipee rendered by far the most valuable single service; that she was the main factor in aiding the tanker, inasmuch as she had the long hawser and the greater power, and her commander, a man of great nautical ability and experience, directed the whole operation.

I cannot sustain this contention. I do not underestimate the value of the service of the Ossipee under the guidance of her very able commander; while the cutter rendered very valuable service, she could not get in, close to the ledges, as the smaller vessels could. She had to be piloted by one of the tugs to the point where she could best render service. Under all the circumstances, I think she is entitled to two-fifths of the whole salvage award, and the two tugs to three-fifths. The important question is what should the award for the whole salvage service be? As this court has said in The Rebecca Shepherd, 148 Fed. 727, 733:

"The courts in this circuit have not been in the habit of giving extravagant bounties, and thereby aiding salvors in devouring what the sea has saved."

Of course, precedents have some value, and the learned proctor for the government has brought to the consideration of the court cases of interest. The R. R. Rhodes, 82 Fed. 751, 27 C. C. A. 258; The Professor Koch (D. C.) 260 Fed. 969; The Grace Dollar (D. C.) 103 Fed. 665; The Fair Oaks (D. C.) 205 Fed. 192. While some of these cases present situations somewhat like that in the case at bar, none of the cases are of great aid in deciding what the award should be.

Upon careful examination of all the proofs, I fix the award for the whole salvage service at the sum of $15,000. If the revenue cutter were eligible, I should give her two-fifths of that sum, namely, $6,000. I award to the two tugs, the Cumberland and the A. G. Prentiss, jointly, the sum of $9,000. The libelants recover costs.