**THE DONBASS.**

No. 14910.

District Court, W. D. Washington, N. D.

Aug. 7, 1947.

Bassett & Geisness and John Geisness, all of Seattle, Wash., for W. E. Campbell, libelant.

Frank A. Pellegrini, Asst. U. S. Atty., of Seattle, Wash., for the United States.

Grosscup, Ambler & Stephan and John Ambler, all of Seattle, Wash., for Winslow Marine Railway & Shipbuilding Co., Inc. intervening libelant.

Bogle, Bogle & Gates and Stanley B. Long, all of Seattle, Wash., for Pacific Towboat Co., intervening libelant.

. Cooper & Cooper and Frank L. Cooper, all of Everett, Wash., for Peter T. Walton and others, d.b.a. Walton Brothers Timber Co., intervening libelant.

Bogle, Bogle & Gates and Claude E. Wakefield, all of Seattle, Wash., for Far Eastern States Steamship Line, and others.

BOWEN, District Judge.

I agree with the Commissioner that the salvage services here performed were of a relatively high rank. And except as to the amount of the awards and except as to whether or not certain items uncompensated by the Commissioner should be compensated, the Court adopts and makes by this reference a part of this Court's decision the opinion and report of the Commissioner filed herein June 24, 1947.

With respect to whether, as claimed by libelant, the Commissioner erred in his views expressed concerning the effect of the purported abandonment, the Court wishes to point out that no matter whether the Commissioner was correct or not, the Commissioner's action in that respect does not affect this Court's action. The reason that is necessarily so is that the character of the salvage services rendered here was of so relatively high rank that it, in my opinion, would not affect the Court's views as to the amount of the awards, no matter if the Court disagreed with the Commissioner and, contrary to the Commissioner's

view, held that the purported abandonment was valid.

In view of all the proceedings in this case of which the Court knows, and in view of the testimony before the Commissioner and in view of the Commissioner's opinion, I do not feel, as to the amounts of the salvage awards, that there is any great importance to be attached to that purported abandonment of the vessel to the salvors. If it was the best possible abandonment, it could not, in my opinion, make these salvage services any higher in rank than they are, but it could not make them high enough in rank to entitle the salvors to an award of all of the funds realized from the sale of the salvaged property.

It seems to me that the rank of the salvage services is just as high without the purported abandonment, coming at the time that it did come, as it might have been if the purported abandonment had come at some other time. But I think the Commissioner, who has filed a very able and well-reasoned opinion, took too conservative a view of the work of these salvage services, especially those performed by the members of the crew of the Puente Hills, and I feel that the Commissioner was incorrect in the view expressed by him concerning certain disallowed expenses of the Puente Hills.

██ I, as the Trial Judge before whom all the court proceedings in this case, prior to the appointment of the Commissioner, have been heard, am personally aware of all of such proceedings and the information disclosed thereby concerning the issues in this case, and I believe such prior court proceedings give some light which the Commissioner did not have. Considering all of those proceedings, the opinion and report of the Commissioner, and all the files and records herein, this Court does award to the United States of America, intervening libelant, as owner of the S.S. Puente Hills, for its expenses necessarily incurred on account of the salvage operations, the following: Wages paid to the S.S. Puente Hills' crew, $6,490.35; additional fuel consumed, $2,576.08; food consumed by S.S. Puente Hills' crew and passengers during salvage operations, $1,164.58; radio messages, $221.-

76; effects issued to the survivors of the Donbass by purser of the S.S. Puente Hills, $106.90; 22 days' subsistence furnished by S.S. Puente Hills to Donbass survivors, $494; shipyard repairs for windlass, shaft, etc., $3,302; miscellaneous repairs, $2,342; materials supplied by the United States, $2,160; materials consumed in repairs necessitated by salvage operations $1,660.94;—all of which expense items so allowed to the United States of America being the total sum of $20,518.61; and

This Court does further award to intervening libelant United States of America for salvage services (including all other expenses not included in the foregoing specially allowed expense items), $20,000, the same general award as that allowed by the Commissioner,—the total aggregate sum of all of the foregoing allowances to intervening libelant United States of America being the sum of $40,518.61. This total award and each and all of the component items thereof shall supersede and take the place of any and all awards allowed by the Commissioner to intervening libelant United States of America.

The Court awards to the officers and crew as and for general salvage the sum of $20,000, and to the officers and crew who participated in boarding and working upon the salvaged property, in the course of the salvage operations, as additional awards above their participation in the general award for salvage services to the officers and crew, the following special awards: Captain W. E. Campbell, commanding officer of the S.S. Puente Hills, $2,000; John F. Mason, Second Assistant Engineer, $500; T. W. Heisholt, Chief Officer, $500; John B. Worden, the War Shipping Administration Official, $500; A. E. Kozlowski, Jr., Third Assistant Engineer, $500; W. R. Berry, Deck Maintenance man, $500; G. Mitchell, able-bodied seaman, $500; A. C. Echols, able-bodied seaman, $500; C. A. Kelly pumpman, $500; and Jerry Bradbury, Pharmacist Mate, $250. $6,250 is the total allowed to the crew members, and the grand total, $66,768.61. As stated in this paragraph, these awards shall be in lieu of the corresponding awards allowed by the Commissioner.

## Commissioner's Report

The undersigned Commissioner having heretofore held hearings pursuant to notice given, and having rendered his opinion based upon the evidence and exhibits all as referred to in his certificate as shown in the record herein, does now make the following findings of fact, and render the following as his report.

The Commissioner finds that the following are reasonable and just awards to be made to the several parties named from the proceeds of the sale of the cargo and stern section of the S.S. Donbass, to wit:

| | | |
|---|---:|---:|
| To the United States of America, Intervening Libelants, owner of the S/S Puente Hills | | |
| Awarded as expenses | $10,065.84 | |
| Awarded for salvage services, including other expenses | 20,000.00 | $30,065.84 |
| To officers and crew, general salvage award | | 15,000.00 |
| To the following named officers and crew as additional awards above their participation in the general award for salvage services to the officers and crew: | | |
| Captain W. E. Campbell, Commanding Officer of the S/S Puente Hills | | 1,000.00 |
| John F. Mason, Second Assistant Engineer | | 250.00 |
| T. W. Heisholt, Chief Officer | | 200.00 |
| John B. Worden, the War Shipping Administration Official | | 200.00 |
| A. E. Kozlowski, Jr., Third Assistant Engineer | | 200.00 |
| W. R. Berry, Deck Maintenance man | | 200.00 |
| G. Mitchell, able-bodied seaman | | 200.00 |
| A. C. Echols, able-bodied seaman | | 200.00 |
| C. A. Kelly, pumpman | | 200.00 |
| To Jerry Bradbury, Pharmacist Mate for extraordinary services in attending the birth aboard the S/S Puente Hills of Titania Perkiny | | 100.00 |
| To The Winslow Marine Railway & Shipbuilding Company | | 1,000.00 |
| To Walton Brothers Timber Company | | 2,093.80 |
| To Pacific Towboat Company | | 5,000.00 |
| Total Awards | | $55,909.64 |

There should be paid from the proceeds in the registry of the court the sum of $402.35, fees for the services of a court reporter herein, and the expenses and fees of the Commissioner hereinafter to be fixed by the Judge of this court, and the balance be subject to further order of court.

## Commissioner's Opinion

The S.S. Puente Hills is a "T–2" tanker constructed and operated by and under the direction of the United States War Shipping Administration, and was commissioned in February, 1945 (Tr.164), and at the time of the salvage services hereinafter rendered was of the value of $1,906,937 (Exhibit 75). The vessel has an over-all length of 523 feet, a beam of 68 feet, and a molded depth of 39 feet, and powered by an Electric Motor capable of generating 6600 horse power. All of the machinery of the vessel is located in the stern section, and her normal complement consists of 11 officers and 37 men (Tr.10). The S.S. Donbass was a sister ship of the S.S. Puente Hills (Tr. 200–338).

On September 11, 1945 the S.S. Puente Hills with its full complement of officers and men set out from Galveston, Texas, to any and all points in the Pacific ocean westward thereof, and such other points in the world as the master may direct for a voyage not exceeding one year. This vessel left Okinawa February 13, 1946 bound for the Canal Zone, but prior to February 21st it was directed to make port at San Pedro, California (Tr. 10–11). On the 21st day of February, 1946 the S.S. Puente Hills had aboard about the same officers and men that she had set out with, but in addition thereto had aboard Mr. John B. Worden, a War Shipping Administration official and two navy gun crew men (Tr. 10 and 317 and Exhibit 16). At about 1:40 a. m. (0140) February 21, 1946 the officers and crew of the S.S. Puente Hills discovered red flares in the sky and kept an alert lookout, and upon determining the location of the source of the distress signals the Captain sounded the general alarm and instructed the Mate to have the men put on storm gear, and altered the ship's course in order to approach the vessel that was releasing the distress signals (Tr. 11). The vessel approached a point of approximately 150 yards off the distressed vessel at 3:48 a. m. (0348) and attempted to communicate with her by blinker light, signals, and radio (Tr. 13). At this time the weather was rough, there was a strong breeze (wind force 6) with 30 to 40 feet seas running and with the air temperature of 38 degrees (Tr. 14).

The distressed vessel was the stern section of the S.S. Donbass which was without radio equipment, charts, or navigating in-

struments, except a compass, was laying in the trough of the seas, and the seas were breaking completely over her deck and stack. She was completely covered with oil, was without power of navigation, and was in absolute and utter distress and was a great fire hazard to herself and to the salvaging vessel, officers, and crew (Tr. 15, 206–236). It was then dark and the S.S. Puente Hills felt that the hazard of rescue would be lessened in the day time so they kept their searchlights upon her and circled her until it was day light (Tr. 15, 16, 17). The officers and crew of the S.S. Donbass indicated they wanted a tow (Tr. 18). The officers and crew of the S.S. Puente Hills prepared the lifeboat for launching, prepared the Lyle gun and Shoulder gun to throw a projectile to which was attached lines and thereafter cables to be attached to the S.S. Donbass for towing. Because of unfavorable weather and sea conditions much difficulty was experienced in getting the lines from the S.S. Puente Hills to the S.S. Donbass. While they were rigging the 2 inch insurance wire the stress of the ship's rolling in the heavy sea broke the stream wire so they had to again rig the Lyle gun and repeat the procedure they had gone through. The S.S. Donbass signaled that the lines were secure at 2:45 p. m. (1445). (Tr. 25, 26.)

Extra hazard attended this towing because insufficient salvage gear was at the command of the officers so as to leave one wave length in between the vessels. The vessels were very close together and there was danger at all times of serious damage to each vessel and to the lives of the officers and crews of each. Much skill was required in improvising the attachment of the lines and towing chain so as to reduce as far as possible all rubbing and chafing. During all this time, the seas were constantly breaking over the deck, the men had to frequently jump and hang on to the super-structure or whatever they could hang on to so that they would not be carried away overboard. They were waist deep and shoulder deep in the swirling cold water, and the only men who had storm gear were the deck department (Tr. 27).

At this time the two vessels were 800 miles south of Adak in the Aleution Islands.

The wind and sea was from that direction, and it would probably have been impossible to have towed the vessel into any harbor in those Islands (Tr. 13 and 97).

The S.S. Puente Hills normal speed was 14 knots per hour (Tr. 82), but with the S.S. Donbass in tow she was compelled to proceed cautiously, put on extra watches, and reduce her speed to 3 or 4 knots an hour during her long journey of 22 days and a distance of 2200 miles to Port Angeles, Washington (Tr. 154).

Captain Campbell of the S.S. Puente Hills took notice of the direction and wind force and the conditions of the sea, and from his reckoning determined where he thought the bow section of the S.S. Donbass could be located, and sent a radio message giving this information, and the bow section was picked up at about the place that he thought it would be (Tr. 23 and 169).

Because of sea and weather conditions it was too dangerous to launch a lifeboat until about February 22, at 6:30 a. m. (0630). The Captain then called for volunteers to man number one lifeboat so that some officers and men could board the S.S. Donbass in order to render necessary aid to its crew and passengers and to secure further needed information (Tr. 28, 30). The quality of service being rendered by the crew is demonstrated by the fact that in response to said call each member volunteered to go upon this hazardous mission, and the Captain thereupon selected those he thought best fitted who were:

Mr. T. W. Heisholt, Chief Officer

Mr. Worden, the War Shipping Administration Official

Mr. A. E. Kozlowski, Jr., Third Assistant Engineer

Mr. W. R. Berry, Deck Maintenance man

Mr. G. Mitchell, Able-bodied seaman

Mr. A. C. Echols, Able-bodied seaman

Mr. C. A. Kelly, pumpman (Tr. 29).

The lifeboat made a total of 4 trips and brought 24 surviving crew members of the S.S. Donbass to the S.S. Puente Hills. Among this number were five females, and some of the male members were quite young, but all said that they were members of the crew (Exhibits 10, 11 and Tr.

46-48). While enroute one of the female survivors gave birth to a female child which was named Titinia Perkiny (Tr. 46-48 and Exhibit 2). The Pharmacist Mate, Jerry Bradbury, rendered efficient services upon this occasion, and the mother and infant were properly cared for and did well. It can be imagined that this particular service was not contemplated by the mate when he signed on at Galveston, Texas.

During the journey and not withstanding the caution, and extra watches, but probably because of the heavy sea and wind, the tow was not kept trim, was ungainly, and followed at an angle, the shackles on the S.S. Donbass broke thereby throwing the tow line, consisting of the cable and the chain, into the water and sending the S.S. Donbass adrift. The officers and crew of the S.S.Puente Hills then faced a very perilous situation. The cable chain and stream anchor weighing approximately 45 tons were then attached to the S.S. Puente Hills and with all the winches and windlass and power that it had it could not by direct pull lift this load onto its deck, so it had to get under way in order to throw the chain and wire at an angle of about 45 degrees, and then by hooking up each winch and windlass, and using all available crew and equipment, it managed to lift, link by link, the chain onto the S.S. Puente Hills. The cable was fractured, throwing out wires at frequent intervals, making it difficult to handle, and requiring great skill and effort to re-arrange the tow line and to provide for sufficient anchor chain when arriving at port (Tr. 76). It was necessary also to keep the S.S. Donbass, then adrift, within sight during that part of the operation until the tow line was again made fast to the S.S. Donbass. The winches and windlass had to be worked in unison. The man on the bridge, the men in the engine room, and the men assisting on the deck had to be kept in constant communication and work in complete cooperation in order to perform this difficult task, and when the two vessels were finally brought together so as to attach the tow, it was extremely hazardous because the slightest inattention or miscalculation may have caused a collision between the two vessels in this rough sea, and great damage, and many lives may have been endangered, and great property values lost (Tr. 65, Exhibit 2, Log Book, Feb. 28). During this entire salvage operation, the S.S. Puente Hills was under great stress and strain, suffered some damage, expended much ship stores, and each officer and man constituting the crew and passengers of the S.S. Puente Hills cooperated and worked to their fullest extent at all times (Tr. 98 and 99).

■ On March 14, 1946, the stern section of the S.S. Donbass at the request of its owners' agents was delivered to the Puget Sound Tug & Barge Company in a safe harbor at Port Angeles, Washington. (Exhibit 17 and Exhibit 2, Log Book, March 14.) The S.S. Puente Hills was then about due for her annual overhaul, but instead of going to San Diego she remained in Seattle, was there overhauled, and subsequently chartered out of Seattle. Obviously, certain repairs were made necessary by and should be chargeable to the salvaging operations, while normal wear and tear and the annual repairs and replacements should not be so charged.

■ At the hearing and in the briefs, it was suggested that the cooperative spirit of the members of the crew of the S.S. Puente Hills in entering into contracts performing service upon the S.S. Donbass after she had been anchored at Port Angeles, and while she was being towed from place to place to discharge her cargo and other purposes, should be considered in evaluating the salvage services, but this commissioner is of the opinion that the services there rendered were pursuant to a voluntary contract, entered into by them and they were paid current wages therefor, and such services or spirit cannot augment the award herein.

■ The Puget Sound Tug & Barge Company, as agent of the owners, made an agreement with the Winslow Marine Railway Shipbuilding Company to berth the stern section of the S.S. Donbass at its dock until 8:00 o'clock March 18th at an agreed price of $50 a day. The vessel was not removed from the dock until March 23rd, which greatly inconvenienced the Winslow Marine Railway Shipbuilding Company, prevented it from accepting new

work, and increased its cost of operation (Tr. 320-326). The vessel was next berthed at the wharf of Walton Brothers Timber Company, and by reason of not being made secured, it broke loose and damaged the property of Walton Brothers Timber Company in the sum of $2,093.80.

After the S.S. Donbass broke loose from her mooring at Walton Brothers Timber Company, she was drifting toward rocks with a flood tide and was setting out through Burrows Bay. Whereupon, the Pacific Towboat Company was requested to and did bring her safely to port, and in so doing employed two tugs and put their own property to some risk in putting lines upon the S.S. Donbass and making her secure in safe harbor (Tr. 392).

There was some evidence supporting the intervening libels of Walton Brothers Timber Company, the Winslow Marine Railway & Shipbuilding Company, and the Pacific Towboat Company, but this Commissioner is putting substantial reliance upon the stipulation made by all the parties in open court at a hearing at which they were all present (or had been given due notice thereof) to the effect that the respective libelants may be awarded the following sums, to-wit:

THE WINSLOW MARINE RAILWAY & BUILDING COMPANY ................... $1,000.00
WALTON BROTHERS TIMBER COMPANY ...................................... 2,093.80
PACIFIC TOWBOAT COMPANY............ 5,000.00

The Commissioner's present opinion is that the above named awards should be included in the final decree.

The intervening libelant, the United States of America, offered evidence of expenses incurred by it as the owner of the S.S. Puente Hills by reason of the salvage operations. Manifestly, some of such items such as ship stores issued to the members of the S.S. Donbass could be determined with accuracy, whereas the cost of repairs of the windlass which was out of repair before the operations began and was in great need of repair at the end of the operations, no one could state positively and accurately just the amount that it would have cost to repair the windlass if there had been no salvage operation (Tr. 361, 380, 382).

From listening to the evidence, reading the transcripts, and examining the exhibits, the Commissioner is of the opinion that the following items are properly chargeable to the salvaging operations:

Effects issued to the survivors of S/S Donbass by the purser on the S/S Puente Hills

Total... $ 106.90

(Exhibit 18, 19 and Tr. 105 and 106)
Twenty-three survivors who received subsistence for twenty-two days

Total... $ 494.00

(Exhibit 18 and Tr. 105, 106)
Shipyard repairs, windlass, shaft, and etc.

Total... $ 3,302.00

Miscellaneous repairs

Total... $ 2,342.00

(Exhibit 79 to 81 and Tr. 348 to 377)
Materials supplied by government

Total... $ 2,160.00

(Exhibit 83 and Tr. 386)
Materials purchased from Sunde & d'Evers and probably consumed in repairs made necessary by salvage operations

Total... $ 1,660.94

(Exhibit 79 and Tr. 369)

Total Established Salvage Expenses $10,065.84

In addition to the foregoing there were a large number of items described and paid for subsequent to the beginning of the salvaging services, and continuing until the stern section of the S.S. Donbass was ultimately sold to the Pacific Gas & Electric Company about October 4, 1946 (Exhibit 77). But it must be remembered that many of these items would have been paid if no salvage services had been rendered, and no witness testified as to the many different items so that the Commissioner can say that these were caused by the salvaging services. For instance, there was the wages of the crew, and the oil consumed, and the surveyor's bill, radio messages, piloting services, and etc. To push it a step further, it might be mentioned that there was probably insurance and interest on the investment which continued during the salvaging services, but the Commissioner is of the opinion that all, except the foregoing itemized expenses clearly chargeable to the salvaging services, should be included without

further detail in the award to be made herein.

This brings us to the more serious and disputed question as to what award should be made as salvage service as distinguished from salvage expense to the intervening libelant, United States of America, and what awards should be made to the officers and crew of the S.S. Puente Hills.

At the outset of the considerations of these questions we are met with the contention of the libelants that they are entitled to all the proceeds of the sale of the S.S. Donbass, and the cargo now deposited with the clerk of this court except the cost and expenses and the amount agreed to be awarded to the intervening libelants. They base their claim upon exhibits 73 of which the following is a copy:

Notice of Abandonment

State of Washington }
County of King      } SS

Captain D. Kladov, acting in behalf of the Far Eastern Steamship Company, with headquarters in Vladivostok, and A. B. Pushkarev, the Chief Mate and Acting Master of the SS "Donbass", which was operated by said Far Eastern Steamship Company, being duly authorized in the premises, hereby for and on behalf of our principals surrender and abandon the stern part of the said vessel now lying in Eagle Harbor, Puget Sound, together with the tackle, furniture and apparel thereon and the cargo with which said part of the vessel is now laden, but excepting personal effects of members of the crew, to the salvors of said part of said vessel.

(Signed) Kladov<br>(Signed) Pushkarev

Witnesses:
  (Signed)  J. S. Denise
  (Signed)  Helen Boylon
Subscribed and sworn to before me this 20th day of March, 1946.

(Signed)  John Geisness<br>Notary Public in and for the<br>State of Washington, residing<br>at Seattle

At the time this instrument was signed and delivered the vessel was then in the custody of the United States Marshal under processes of this court and the crew of the S.S. Puente Hills paid no value therefor, and the owners of the vessel or the officers or crew of the vessel received no consideration therefor; the instrument is not executed in the form nor with the formality required for a bill of sale for a vessel of this type, and it is not shown that the signatories thereto have authority to execute a bill of sale; the owners are in no way estopped, and those who signed the instrument did not have authority to sell said vessel nor to execute an instrument of abandonment which would have the same effect. It is inferable from the surrounding circumstances that what was intended by all the parties to said instrument was that the officers and crew of the S.S. Donbass were leaving the same in the hands of the Marshal, and were being relieved of further responsibility for its care, and that thereafter the S.S. Donbass would be disposed of as provided by law which indeed is the very purpose of these proceedings.

In approaching the main problem of determining the amount to award for salvage services to the owner and crew of the S.S. Puente Hills, we are aided by briefs citing general principles and many adjudicated cases. The cases cited in the briefs of the libelants and the brief of the intervening libelants are somewhat different, but the principle seems about the same.

Page 1 of respondent's brief recites:

The following elements are taken into consideration under the law of salvage in making salvage awards:

1. Risk to which salvors were exposed.

2. Danger to salved vessel, cargo and lives on board.

3. Value of salved property.

4. Value of salving vessel.

5. Time, labor and expenses incurred by salvors.

6. Promptitude, skill and success of salvors. The Livietta, 5 Cir., 242 F. 195; The Blackwall, 10 Wall. 1, 19 L.Ed. 870; The Alamo, 5 Cir., 75 F. 602; The Craster Hall, 5 Cir., 213 F. 436; The Sandringham, D.C., 10 F. 556; The Egypt, D.C., 17 F. 359; The Flottbek, 9 Cir., 118 F. 954.

Page 1 of libelants brief recites: If circumstances do develop which require the Court to fix the amount of award independently of the abandonment, the amount of award and its apportionment lies in discretion. The Elkridge, 2 Cir., 30 F.2d 618, 619; The Richmond, 60 U.S. 150, 19 How. 150, 15 L.Ed. 618.

No one case is exactly like another and hence there is a wide field for the exercise of judgment. The Anahuac, D.C., 295 F. 346.

The general principles governing the allowance of salvage were laid down in The Blackwall, 10 Wall. 1, 19 L.Ed. 870, in these oft-quoted and followed words:

"Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service:

"(1) The labor expended by the salvors rendering the salvage service.

"(2) The promptitude, skill and energy displayed in rendering the service of saving the property.

"(3) The value of the property employed by the salvors rendering the service, and the danger to which such property was exposed.

"(4) The risk incurred by the salvors in securing the property from the impending peril.

"(5) The value of the property saved.

"(6) The degree of danger from which the property was rescued."

The same principle is expressed in other words by Professor Robinson in his book on Admiralty, page 739, as follows:

"In the judicial technique of handling the noncontract salvage cases, the first step is to state the respective values of the vessels, or rather of the ventures, for the value of the cargo on the rescued ship is also stated. The award is made with reference to these values, and to the danger involved. In the danger is reckoned both that in which the rescued vessel was at the time, and the risk to the salvor in aiding her. The length of the service and its danger and difficulty, and the degree of success attained, the value of the salvor's property risked—all are factors in the problem of how much the actual

award will be. These items are used to base an award in addition to the actual out-of-pocket expense or the incidental expense, loss of time, etc., for deviation and so on to which the salvors may be exposed.

"The conditions at sea today are such that the courts tend toward regarding the award as based, not upon the theory of prize money or bonus, so much as upon the principle of compensatory service, plus a reasonable reward to insure willing service."

The primary principle upon which salvage awards are allowed at all is the principle of encouraging rescue. This was stated in The Blackwall, supra, [10 Wall. 1, 19 L.Ed.] page 875, as follows:

The facts herein before recited have shown the risk to the salvors, the danger to the salved vessel, the time, labor and expenses incurred by the salvors, the promptitude, skill, and energy displayed in rendering the salvage services, but leaves for determination the value of the salving vessel and the value of the salved property.

With reference to the value of the salved property the records and files in this case disclose that the stern section of the S.S. Donbass was sold at a public sale duly and regularly advertised and conducted at which competitive bids were made for the sum of $110,000 and that that sale was duly and regularly confirmed by the Judge of this Court.

As against that evidence there was testimony of one A. H. MacDonald, a marine surveyor who had had some experience in inspecting, appraising, repairing, supervising, and bidding on construction jobs, but was not shown to have had much experience in any sale comparable to the stern section of the S.S. Donbass, and seemed to approach the subject from a replacement cost rather than the fair market value of the S.S.Donbass "as is where is" and, therefore, the Commissioner could give little consideration to his opinion that the property was worth twice as much as it sold for.

However, the intervening libelants, United States of America, offered proof that in September, 1946, after it had become the successful bidder, it had sold the vessel for $125,000. The Commissioner finds that the

stern section of the S.S. Donbass was worth $120,000 when delivered by the salvors to the owners at Port Angeles March 14, 1946; and that the cargo then aboard was of the value and was sold for $9,550. There is some authority for this method of arriving at values. 56 C.J. 82; 56 C.J. 84, 85. The S.S. Puente Hills at the time of rendering the salvage services was roughly of the approximate value of $1,900,000 (Exhibit 75). Considerable sums of money were expended by the Marshal or by others under the direction of the Marshal in caring for the S.S. Donbass, and those sums were deducted from the sale price of the ship and cargo, and the clerk now holds in the registry of this court as the balance of the proceeds of sale of hull and cargo the sum of $105,813.85.

The commissioner concludes that reasonable and just awards are as follows:

| | | |
|---|---:|---:|
| To the United States of America, Intervening Libelants, owner of the S/S Puente Hills | | |
| Awarded as expenses | $10,065.84 | |
| Awarded for salvage services, including other expenses | 20,000.00 | $30,065.84 |
| To officers and crew, general salvage award | | 15,000.00 |
| To the following named officers and crew as additional awards above their participation in the general award for salvage services to the officers and crew: | | |
| Captain W. E. Campbell, Commanding Officer of the S/S Puente Hills | 1,000.00 | |
| John F. Mason, Second Assistant Engineer | 250.00 | |
| T. W. Heisholt, Chief Officer | 200.00 | |
| John B. Worden, the War Shipping Administration Official | 200.00 | |
| A. E. Kozlowski, Jr., Third Assistant Engineer | 200.00 | |
| W. R. Berry, Deck Maintenance man | 200.00 | |
| G. Mitchell, able-bodied seaman | 200.00 | |
| A. C. Echols, able-bodied seaman | 200.00 | |
| C. A. Kelly, pumpman | 200.00 | |
| To Jerry Bradbury, Pharmacist Mate for extraordinary services in attending the birth aboard the S/S Puente Hills of Titania Perkiny | 100.00 | |
| To The Winslow Marine Railway & Shipbuilding Co. | 1,000.00 | |
| To Walton Brothers Timber Company | 2,093.80 | |
| To Pacific Towboat Company | 5,000.00 | |
| Total Awards | $55,909.64 | |

The officers and members of the crew of the S.S. Puente Hills should participate in the general award for salvage services to the officers and crew in the ratio that their base pay bears to the total award, and the passenger, John B. Worden, and the gunnery crew, Martis W. Danford, and Olan R. Tomlinson should be rated as able-bodied seamen.

In considering and determining the reasonableness of the foregoing awards, it should be borne in mind that the log book covering the salvage period indicates rough sea and wind force up to a strong gale (wind force 9) (Exhibits 2 and 12), that this is a high order of salvage, that the award to the crew includes what might have otherwise been overtime, and that the three last-named awards were incurred after the S.S. Puente Hills had delivered the stern section of the S.S. Donbass to the agents of the owner in a safe harbor and, therefore, should not be included in any percentage consideration.

There should be paid from the proceeds in the registry of the court the sum of $402.35, fees for the services of a court reporter herein, and the expenses and fees of the Commissioner hereinafter to be fixed by the Judge of this court, and the balance should be paid to the claimant for the cargo and the claimant for the hull in the proportion that their established values bear to the said balance.