Let findings of fact, conclusions of law and judgment be presented.

## BARETICH et al. v. UNITED STATES et al.

United States District Court
S. D. New York.
March 27, 1951.

William L. Standard, New York City (Jacquin Frank, New York City, of counsel), for libellants.

John F. X. McGohey, U. S. Atty., New York City, by Max Taylor, and Herbert Ost, Special Attys., Department of Justice, New York City, for respondents.

CONGER, District Judge.

Libel by eleven members of the crew of the S. S. Saint Mihiel for salvage.

Libellants consented to the dismissal of the libel against War Emergency Tankers, Inc.

The S. S. Saint Mihiel was a tanker operated by respondent United States of America.

On April 8, 1945 the Saint Mihiel left New York in convoy. She carried a cargo of six million odd gallons of high-octane gasoline for delivery to England.

In the same convoy and immediately preceding the Saint Mihiel was another tanker, the Nashbulk. On April 9, 1945, at about 8 p. m. a collision occurred between the Saint Mihiel and the Nashbulk. The Saint Mihiel was struck on her starboard side at or about the No. 6 tank, and as a result fire broke out on the Saint Mihiel, which soon enveloped the whole vessel. As one of the witnesses stated, "She immediately went up into flames." The captain and the chief mate were on the bridge at the time. According to one of the crew, the conditions were such that the captain stated then that, "We could not possibly do anything with her. We could not fight it and we would have to abandon ship." The general alarm was then sounded. At that time there was a hole on the top of the deck and the rough seas were going into the side of the ship and forcing the gasoline up (from No. 6 tank) and spreading it over the entire vessel and into the sea, so that soon the whole ship was afire as well as the water on the starboard side. The flames on the ship were higher than the mast. There was, of course, a fear in the minds of some of the men that the Saint Mihiel would blow up. There was ammunition on board for the use of the gun crew and it was exploding. As one may very well imagine, there was great confusion and panic. The captain was yelling, "Abandon ship, abandon ship", about the time the burning gasoline on the water was beginning to encircle the ship.

After some difficulty the No. 2 life boat on the portside was launched, and some of the officers and men attempted to leave the vessel that way, but the flames started to come into the boat and they were compelled to jump into the sea. Most of the men jumped into the sea from the Saint Mihiel and started to swim away. The survivors were picked up by two of the escort destroyers in the convoy, which had turned back to rescue the men. Out of the crew of 50, 27 perished including the captain and the chief mate.

Several of the destroyer escorts were ordered to stand by and they cruised around all night in search of survivors, and the Nashbulk stood by all night. In the meantime the fire on the Saint Mihiel continued. She was in sight of the destroyers and the Nashbulk during the night. At 7:30 the next morning she was about five miles from one of the destroyers.

In the meantime and about 1 P. M. of April 9th, two destroyers, which were in a west bound convoy in the neighborhood of Bermuda were ordered to the scene of the collision to stand by and to assist. The destroyers were the Edsall and the Stewart. At the same time the navy tugs Kiowa and Escape stationed at Bermuda were also ordered to the scene.

The Stewart and the Edsall arrived in the immediate vicinity of the Saint Mihiel at about 8 A. M. At that time the Nashbulk and the Saint Mihiel were about ten miles apart and the Saint Mihiel was still aflame and the flames were rather high. As Commander Slayden of the Edsall described it, "When we first arrived in the area the Saint Mihiel was aflame, principally midships, with flames billowing up 60 to 100 feet in height and flames were still licking up the side of the ship from the gasoline that was spilled out into the water."

Commander Slayden who was the Navy officer in charge directed the Stewart to put an inspection party on board to determine the condition of the Saint Mihiel. Lieutenant Day of the Stewart with 6 men boarded the Saint Mihiel at about 9 A. M. They made their inspection and reported that it would be feasible to put the fires out and the order was given them by Commander Slayden to proceed with that operation.

At that time the main fires were the gasoline fires burning through the open hatches. The main one was just aft of the deckhouse. It was burning flames of varying intensity, but as Lieutenant Day of the

Stewart stated, "Apparently the gas would accumulate in the tank and all of a sudden burst forth, and a big pillar of smoke and flame would shoot up—rather alarming." There were a number of smaller gasoline fires forward of the deckhouse.

After an inspection of half an hour it was determined that it was feasible to put out the fires and the Stewart was ordered alongside the tanker. 31 men and 3 officers from the Stewart boarded the Saint Mihiel. They were equipped with all the necessary fire fighting equipment. At 1 P. M. it was reported that the fire was under control. There were still some fires going on but it was felt they could be controlled. At about 1:15 P. M. Commander Slayden, with an engineer and another officer came aboard. There were a number of smoldering fires and still quite a bit of smoke. The men were locating these as rapidly as they could and extinguishing them.

After an inspection of the engine room and fire rooms, which appeared to be in good condition, and after a consultation, and since there was steam in the power plant, the Navy officers agreed that it was practical to bring in the Saint Mihiel on her own power. It was decided to bring as many men as the Edsall could spare to man the plant and the ship and stations and also to call on the survivors of the Saint Mihiel who were familiar with the engineering plan to assist in its operation.

Commander Slayden then sent a message to the Nashbulk requesting volunteers to reboard the Saint Mihiel. When the message was relayed to the Nashbulk, Baretich, second mate of the Saint Mihiel lined up the survivors of the fire—those who were able to get on deck—and called for volunteers to reboard the Saint Mihiel. All did volunteer. Some of the men were not in good condition and they were eliminated. In all, 14, including the second mate were finally selected. In the crew to take the Saint Mihiel back to New York were 4 officers and 11 men from the Edsall, 4 men from the Stewart and 14 men from the Saint Mihiel and 8 of the armed guard of the Saint Mihiel. The Lieutenant of the Edsall was ordered to go aboard the Saint Mihiel and bring her back to New York.

Provisions, fire fighters' equipment and other equipment, jackets, ropes, etc. were put on board from one of the destroyers and finally somewhere between 5 and 7:30 P. M. of April 10 the Saint Mihiel got under way. The Edsall lead and controlled the navigation. It determined the courses and speeds and direction and relayed that information to the Saint Mihiel personnel, who complied. After fog set in thick and when the Edsall was not in sight, steering instructions were received by the Saint Mihiel over the TBY system.

The journey ended when the Saint Mihiel anchored off the Statue of Liberty on April 12, 1945.

■ Ordinarily, members of a crew are not entitled to salvage because they are obligated by their contract to do all in their power to save the vessel. An exception to this rule has evolved, however, where the circumstances show an absolute abandonment of the vessel by the crew or a discharge from the service of the ship. Mason v. Blaireau, 2 Cranch 238, 2 L.Ed. 266; Hobart v. Drogan, 10 Pet. 108, 9 L.Ed. 363.

I think the circumstances of the instant case warrant the finding that there was an absolute abandonment by the crew of the Saint Mihiel.

The plaintiffs, with the other members of the crew of the Saint Mihiel, cooperated with the Navy men in the task of navigating and bringing back this stricken tanker. It was a difficult task, fraught with considerable danger. Baretich, second mate of the Saint Mihiel was the senior surviving officer. He cooperated fully with the Navy officer, Lieutenant Yeomans and rendered extremely meritorious service. All of the work necessary to bring this tanker into port was rendered by the Navy personnel and these libellants and the other men of the Saint Mihiel. There was complete cooperation between the two officers—Yeomans and Baretich.

Baretich deserves special commendation, as do his crew. Lieutenant Yeomans recognized this. In April, 1945, he wrote to the General Agent of the War Emergency Tankers in which he praised Baretich and the crew of the Saint Mihiel. I quote from the letter:

"* * * I have the greatest respect and professional admiration for these men. Their actions reflect great credit on the merchant marine.

"I feel so strongly about the outstanding ability and professional skill of the second mate, Mr. B. B. Baretich that I think it should be called to your attention. Mr. Baretich's disregard for personal safety and devotion to duty is of the highest order. *His professional skill and complete cooperation contributed considerably to the successful salvaging and return to port of the severely damaged ship.* During the long trip back to port Mr. Baretich's performance of duty and complete obedience to orders was most commendable. I believe you are most fortunate in having such a man in your service."

The United States Maritime Commission recognized the services of Baretich and awarded him the Merchant Marine Distinguished Service Medal. I quote a portion of the contents of the Citation: "His extraordinary courage and skillful seamanship under circumstances which indicated possible annihilation will be a lasting inspiration to all seamen of the United States Merchant Marine."

There is no question that the lives of the men and the safety of the vessel were in peril. Practically the entire ship was ablaze, the flames shooting 100 feet into the air; there was a hole in the side of the ship so that the water entering was forcing burning gasoline over the vessel and spreading it to the water; the gun crew's ammunition on deck was exploding; the lifeboats could not be launched.

Under these conditions the captain ordered the ship abandoned. The crew responded by going over the side. Uppermost in the minds of many was the thought that the ship would blow up. Obviously, in these wild moments of escape, no one speculated about whether he would return or not. Whatever notions entered their frantic minds, it is clear that a return to that inferno was not one of them. Here was no situation where the crew was withdrawing to observe the fate of the vessel, such as in Drevas v. U. S., D.C.Md.1945, 58 F.Supp.

1008. Rather, the crew was escaping a death trap, some even without life preservers.

The fact that Baretich counseled delay when the Navy Commander suggested the destruction of the vessel in no way detracts from the idea of abandonment. He knew the ship and cargo were valuable and his experience told him the fire might burn out. There is no evidence that he anticipated such a fact but he told the Navy Commander of such a possibility.

The cases cited by the respondent are all distinguishable from the present.

■ I find all of the elements here present which enter into an award for salvage to members of a crew, i. e.:

A. A Marine peril.

B. The abandonment of the vessel with no hope of return.

C. Service voluntarily rendered.

D. The success in whole or in part of the undertaking.

See The Sabine, 101 U.S. 384, 25 L.Ed. 982; Mason v. Blarieu, supra.

The main problem in the case, therefore, is the amount of the award for salvaging the Saint Mihiel.

The parties have stipulated that the Saint Mihiel had a value of $500,000 when she was returned to New York. It is undisputed that the value of the gasoline saved was $641,032. In fact, therefore, a total of $1,-141,032 in ship and cargo was saved. But the cargo is not before this Court, nor is the shipper, the British Ministry of War Transport, nor the consignee, The Petroleum Board.

Actually, the gasoline had been turned over to the British pursuant to the Wartime Lend-Lease arrangement.

■ The respondent objects to the inclusion of the cargo value in determining the salvage award. And rightly so, I believe. The libellants attempt to show that the goods belonged to the United States under Lend-Lease, but I feel that, despite whatever title the United States may have had in the goods and the fact that their loss would have been borne by the United States,

the goods were really dedicated to the British and the beneficial interest was in them. This is evidence from the fact that the British paid the cost of shipment, were responsible for the same whether the goods were lost or not, and were required to contribute to any salvage award under certain conditions as expressed in the "New Jason Clause" of the bill of lading. It is further obvious that any "title" the United States may have retained was of little significance in consumable goods such as gasoline.

■■ It must first be understood that in determining the value of salvage services, the efforts of all the ships and personnel who contributed to the salvage must be considered. And in this connection certain elements are used to guide in the task.[1] Usually, the respective values of the ships, salvors and the salved, are stated; the danger in which the rescued ship is found and the danger in which the rescuing ships are put, is considered; the labor expended, the skill displayed and the risk entailed by salvors is a further element.

■ In the first place, it is obvious that the United States Navy contributed the most to the salvage of the Saint Mihiel. It used its vessels, which are of great value[2] and its men in saving the lives of the crew of the Saint Mihiel. And life salvage is compensable when involved with the salvage of property. See Robinson Admiralty, p. 717. The Edsell directed the course of the Saint Mihiel back to New York. Much Navy equipment was put aboard the Saint Mihiel to assist in the return voyage. Navy personnel made up a majority of the crew which returned the Saint Mihiel. A Navy fire fighting team with Navy equipment went aboard at great risk of life to put out the fire.

It may easily be inferred, therefore, that without the Navy, there would have been no salvage, but it is fairly certain that the Saint Mihiel would have been salvaged without the efforts of the libellants.

I feel, therefore, that the Navy contributed 90% to the success of the venture and the libellants and 3 others who are not parties to this proceeding, 10%. Actually, of course, their efforts are not measureable in terms of percentages and the figures I express merely reflect my notion of what the parties did.

I have examined many cases on the subject of the amount of the award in order to influence my discretion but they are of little help really, except to the extent that they afford yardsticks for comparison to the present situation.[3] Experiences as harrowing as those suffered by the libellants are not common. The skill and bravery displayed by them, and the dangers to which they were subjected are also not common. I believe, therefore, that they should be rewarded well for their services, and, in my discretion, I award the sum of $2000 to each of the libellants. In fixing this sum I have taken into consideration the skill and bravery displayed by these libellants and the potential dangers to them on this journey. The sum awarded here may not seem large enough to compensate them for all that they did, for the risks that they took, yet one must be realistic. The sum is one that I think is fair and one that will stand attack.

There was no plea made that any one of the libellants contributed more or less to the salvage and, therefore, should share differently. That is the reason I have treated them all alike.

Settle a decree in accordance with the foregoing.

1. The Blackwall, 10 Wall. 1, 19 L.Ed. 870.

2. No evidence as to the actual value of the Navy ships was offered.

3. Some of the cases are the following: The Blackwall, supra; The Elkridge, 2 Cir., 30 F.2d 618; The Sandringham, D. C., 10 F. 556; The Egbert H., 5 Cir., 131 F.2d 111; The Lamington, D.C., 86 F. 675; The Melody, 9 Cir., 157 F.2d 448; The Livietta, 5 Cir., 242 F. 195; Waterman S. S. Co. v. Dean, 4 Cir., 171 F.2d 408; The Kia Ora, 4 Cir., 252 F. 507; Joncich v. Xitco, 9 Cir., 172 F.2d 1003; The Anahuac, D.C., 295 F. 346; The Angie & Florence, D.C., 77 F.Supp. 404; The Odenwald, D.C., 71 F.Supp. 314; The Donbass, D.C., 74 F.Supp. 15; Usatorre v. The Victoria, 2 Cir., 172 F. 2d 434.